Rosemary M. Rivas (SBN 209147)
E-mail address: rrivas@finkelsteinthompson.com
**LEVI & KORSINSKY LLP**
44 Montgomery Street, Suite 650
San Francisco, California 94104
Telephone: (415) 291-2420
Facsimile: (415) 484-1294

*Counsel for Plaintiff Atef Isaac and the Proposed Class*

[*Additional Counsel on Signature Page*]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ATEF ISAAC, Individually and on behalf of all others similarly situated, | Case No.:  3:17-cv-1014 |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTION 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** |
| v. | |
| INVENSENSE, INC., BEHROOZ ABDI, AMIR FAINTUCH, USAMA FAYYAD, EMIKO HIGASHI, JON OLSON, AMIT SHAH, ERIC STANG, and YUNBEI "BEN" YU, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff ("Plaintiff"), by and through his attorneys, alleges upon personal knowledge as to himself, and upon information and belief based upon, among other things, the investigation of counsel as to all other allegations herein, as follows:

### SUMMARY OF THE ACTION

1.      This is a shareholder class action brought by Plaintiff, on behalf of himself and other holders of the common stock of InvenSense, Inc. ("InvenSense" or the "Company") against InvenSense and InvenSense's Board of Directors (the "Individual Defendants" or the "Board"),

for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78n(a) and 78t(a), and Rules and Regulations promulgated thereunder, including Rule 14a-9, 17 C.F.R. §240.14a-9, in connection with the proposed merger of InvenSense by TDK Corporation through TDK Sensor Solutions Corporation ("Merger Sub") (collectively, "TDK").

2.      InvenSense designs, develops, markets and sells sensor systems on a chip, including accelerometers, gyroscopes and microphones for the mobile, wearable, smart home, gaming, industrial, and automotive market segments. The Company delivers leading solutions based on its advanced motion and sound technology. The Company targets solutions such as: smartphones, tablets, wearables, console and portable video gaming devices, digital television and set-top box remote controls, fitness accessories, sports equipment, digital still cameras, automobiles, ultra-books, laptops, hearing aids, stabilization systems, tools, navigation devices, remote controlled toys and other household consumer and industrial devices.

3.      On December 21, 2016, InvenSense and TDK jointly announced that they had entered into a definitive agreement pursuant to which TDK would acquire all of the outstanding shares of InvenSense for $13 per share in cash, in an acquisition valued at approximately $1.3 billion.

4.      Pursuant to the Agreement and Plan of Merger, dated December 21, 2016 (the "Merger Agreement"), Merger Sub will merge with and into Company, with InvenSense surviving as a wholly-owned subsidiary of TDK (the "Proposed Transaction" of "Transaction").

5.      According to a December 21, 2016 article published by Motley Fool, titled "Farewell, InvenSense: We Hardly Knew Ye":

> TDK will be paying $13 per share for InvenSense . . . That values InvenSense at $1.3 billion, a cool $1 billion less (or 43% less) than what the company's valuation peaked at in September 2014 ($2.3 billion).

CLASS ACTION COMPLAINT

6.      To induce stockholders to vote in favor of the Proposed Transaction, on February 3, 2017, in violation of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9, Defendants filed, or caused to be filed, a materially false and/or misleading proxy statement (the "Proxy") on Schedule 14A with the U.S. Securities and Exchange Commission (the "SEC"). Among other things, the Proxy contains the unanimous recommendation of the Board that InvenSense shareholders vote "for" the proposal to adopt the Merger Agreement. However, the Proxy misrepresents and omits material information.

7.      For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

9.      Venue is proper pursuant to 28 U.S.C. §1391(b) because Defendants systematically conduct business on a regular basis in this District and/or reside in this District, and a substantial part of the events and omissions complained of herein occurred in this District.

## THE PARTIES

10.     Plaintiff Atef Isaac, a resident and citizen of Santa Clara, California, and has been at all times relevant hereto, a continuous stockholder of InvenSense.

11.     Defendant InvenSense is a Delaware corporation, with its principal executive offices located at 1745 Technology Drive, Suite 200, San Jose, CA 95110.

12.     Defendant Behrooz Abdi has served as President, Chief Executive Officer, and a Director of the Company.

3

13. Defendant Amir Faintuch has served as a Director of the Company and a member of the Nominating and Corporate Governance Committee.

14. Defendant Usama Fayyad has served as a Director of the Company and a member of the Compensation Committee.

15. Defendant Emiko Higashi has served as a Director of the Company and a member of the Audit Committee.

16. Defendant Jon Olson has served as a Director of the Company and a Chairman of the Audit Committee.

17. Defendant Amit Shah has served as a Director of the Company, Chairman of the Board, and Chairman of the Compensation Committee.

18. Defendant Eric Stang has served as a Director of the Company, Chairman of the Nominating and Corporate Governance Committee, and a member of the Audit Committee.

19. Defendant Yunbei "Ben" Yu has served as a Director of the Company and a member of the Compensation Committee.

20. Defendants Abdi, Faintuch, Fayyad, Higashi, Olson, Shah, Stang, and Yu are collectively referred to herein as the "Individual Defendants" or "Board."

21. Non-party TDK is a leading electronics company based in Tokyo, Japan. Its principal executive offices are located at Shibaura Renasite Tower, 3-9-1 Shibaura, Minato-ku, Tokyo 108-0023. Upon the consummation of the Transaction, InvenSense will be a direct wholly-owned subsidiary of TDK.

22. Non-party Merger Sub is a Delaware corporation and an indirect wholly-owned subsidiary of TDK. Merger Sub was formed solely for purpose of facilitating the Proposed Transaction.

**CLASS ACTION ALLEGATIONS**

23.     Plaintiff brings this action on his own behalf and as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of all common stockholders of InvenSense who are being and will be harmed by Defendants' actions described herein (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

24.     This action is properly maintainable as a class action because:

(a)     The Class is so numerous that joinder of all members is impracticable.  As of January 13, 2017, there were over 94 million shares of InvenSense common stock issued and outstanding.  The actual number of InvenSense stockholders will be ascertained through discovery;

(b)     There are questions of law and fact that are common to the Class, including:

i)      Whether Defendants violated Sections 14(a) and 20(a) of the Exchange Act in connection with the Proposed Transaction;

ii)     Whether the Proxy omits and/or misstates material information;

iii)    Whether Defendants have failed to engage in a fair process and obtain the best price available for the benefit of Plaintiff and the other members of the Class in connection with the Proposed Transaction; and

iv)     Whether Plaintiff and the other members of the Class would suffer irreparable injury if the Proposed Transaction complained of herein were consummated.

(c)     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the

CLASS ACTION COMPLAINT

claims of the other members of the Class and Plaintiff has the same interests as the other

members of the Class. Accordingly, Plaintiff is an adequate representative of the Class and will

fairly and adequately protect the interests of the Class;

(d)    The prosecution of separate actions by individual members of the Class

would create the risk of inconsistent or varying adjudications, which would establish

incompatible standards of conduct for Defendants, or adjudications with respect to individual

members of the Class that would, as a practical matter, be dispositive of the interests of the other

members of the Class not parties to the adjudications or substantially impair or impede their

ability to protect their interests; and

(e)    Defendants have acted, or refused to act, on grounds generally applicable

to, and causing injury to, the Class and, therefore, injunctive relief on behalf of the Class as a

whole is appropriate.

## SUBSTANTIVE ALLEGATIONS

**Background**

25.    InvenSense designs, develops, markets and sells sensor systems on a chip,

including accelerometers, gyroscopes and microphones for the mobile, wearable, smart home,

gaming, industrial, and automotive market segments.  It delivers leading solutions based on

advanced motion and sound technology. It targets solutions such as: smartphones, tablets,

wearables, console and portable video gaming devices, digital television and set-top box remote

controls, fitness accessories, sports equipment, digital still cameras, automobiles, ultra-books,

laptops, hearing aids, stabilization systems, tools, navigation devices, remote controlled toys and

other household consumer and industrial devices develops and produces computing and

connectivity solutions for cloud infrastructure and data centers, including an array of

connectivity and embedded computing products. The Company was incorporated in California,

reincorporated in Delaware in 2004, and has its corporate offices in San Jose, California.

**InvenSense's Recent Performance**

26.     On May 9, 2016, InvenSense issued a press release reporting its financial results for the quarter ended April 3, 2016 and fiscal year 2016, which stated, in part, as follows regarding the Company's performance and growth prospects:

> Gross margin determined in accordance with U.S. generally accepted accounting principles (GAAP) was 41 percent for the fourth quarter of fiscal 2016, consistent with 41 percent for the third quarter of fiscal 2016. GAAP gross margin for the fourth quarter of fiscal 2016 included stock-based compensation and related payroll taxes and amortization of acquisition intangibles. Excluding these items, non-GAAP gross margin was 45 percent for the fourth quarter of fiscal 2016, up from 44 percent for the third quarter of fiscal 2016.
>
> *          *          *
>
> Net revenue for the fiscal year 2016 was $418.4 million, up $46.4 million, or 12% from $372.0 million for the fiscal year 2015.

27.     Commenting on the financial results, Defendant Abdi stated, in part, as follows:

> ***Q4 was a solid quarter, capping off a productive year for InvenSense. Throughout fiscal 2016, we drove significant technology advancement in key use cases that are fueling sensor adoption today.*** These use cases can be applied across a variety of vertical markets and applications, which we believe will enable us to maximize our R&D investments and drive significant TAM expansion. ***Our market-leading solutions continued to gain traction in emerging Internet of Things (IoT) platforms such as drones, virtual and augmented reality, wearables, smart home, and industrial applications. We believe that the broad applicability of our portfolio positions us for continued diversification and growth in these exciting markets.***[1]

28.     On June 23, 2016, the Company announced that it was ranked as the leader in the "Q1 2016 Sensors for Mobile Devices Database" by IHS, Inc.  According to the quarterly published IHS Mobile Devices Database report, InvenSense was the #1 Motion Sensor supplier, based on revenue (gyroscope, accelerometer, magnetometers, and combo sensors) across the handset segment, the largest market segment for sensors. The quarterly database analyzed more

---

[1] All emphasis added unless otherwise noted.

1  than 20 sensor manufacturers.

2      29.    On July 28, 2016, InvenSense issued a press release reporting its financial results

3  for the quarter ended July 3, 2016, which included the following highlights:

> Gross margin determined in accordance with U.S. generally accepted accounting
> principles (GAAP) was 41 percent for the first quarter of fiscal 2017, consistent with
> the fourth quarter of fiscal 2016. GAAP gross margin for the first quarter of fiscal
> 2017 included stock-based compensation expense and related payroll taxes and
> amortization of acquisition-related intangibles. Excluding these items, non-GAAP
> gross margin was 46 percent for the first quarter of fiscal 2017, up from non-GAAP
> gross margin of 45 percent for the fourth quarter of fiscal 2016.

        30.    Commenting on the financial results, Defendant Abdi stated, in part, as follows:

> While worldwide consumer and mobile markets were somewhat soft in the first
> fiscal quarter of 2017, ***the InvenSense team delivered on our financial guidance,***
> ***posting incrementally higher non-GAAP gross margins in a competitive***
> ***environment. This was the result of improved manufacturing efficiency and***
> ***product mix, as well as our traction in both mobile and non-mobile markets.*** We
> are successfully leveraging investments in our robust sensor platform to integrate and
> enable high-value, consumer-driven use cases, such as image stabilization,
> augmented and virtual reality, and inertial navigation, for applications spanning a
> number of vertical markets. ***These are creating exciting growth opportunities that***
> ***we believe play well into our focused strengths***.

        31.    On November 3, 2016, InvenSense issued a press release reporting its financial

results for the quarter ended October 2, 2016, which included the following highlights:

> Net revenue for the second quarter of fiscal 2017 was $79.8 million, up 32 percent
> from $60.6 million for the first quarter of fiscal 2017 . . .

> Gross margin determined in accordance with U.S. generally accepted accounting
> principles (GAAP) was 42 percent for the second quarter of fiscal 2017, up from 41
> percent for the first quarter of fiscal 2017.

        32.    Commenting on the financial results, Defendant Abdi stated, in part, as follows:

> ***The InvenSense team delivered solid results in the second fiscal quarter. We are***
> ***encouraged that our R&D investments are beginning to pay off with new design***
> ***wins which we anticipate will allow us to penetrate new markets.*** While the
> consumer and mobile markets were and remain soft, we believe this design win
> activity will position us for strong top line growth in fiscal 2018 as we strive to
> diversify our business.

8

CLASS ACTION COMPLAINT

1

2   **The Defective Sales Process**

3        33.    The Board and management held a telephonic meeting on November 23, 2015 to

4 discuss, among other things, an unsolicited oral proposal regarding a potential acquisition of

5 InvenSense received by Defendant Abdi from the CEO of Company A on November 17, 2015.

6 Defendant Shah also discussed a call that he had received from a representative of Company A.

7 Company A's verbal proposal consisted of approximately $3.81 per share in stock and

8 approximately $11.44 per share in cash. The Board determined that it discuss Company A's

9 proposal at its upcoming strategic offsite meeting on December 18, 2015, after additional review

10 of the proposal by InvenSense's management and by Qatalyst Partners and another investment

11 bank.

12        34.    At its December 18, 2015 meeting, the Board, together with management,

13 reviewed InvenSense's long-range plan and its prospects as a standalone entity.  Representatives

14 of Qatalyst Partners discussed InvenSense's then current long-range plan and Company A's

15 proposal. The Board also reviewed input on InvenSense's standalone plan and Company A's

16 proposal provided by another investment bank. After discussion, the Board determined that

17 Company A's oral proposal undervalued InvenSense relative to the value reflected in the long-

18 range plan.

19        35.    On February 3, 2016, representatives of InvenSense met with representatives of

20 Company B to continue ongoing discussions regarding a potential technical collaboration

21 between the two companies.

22        36.    On February 4, 2016, representatives of InvenSense and representatives of TDK

23 held a meeting to discuss their respective product offerings and potential product collaborations.

24        37.    On April 3, 2016, at the request of Company C, Defendants Abdi and Shah had an

9

introductory meeting with representatives of Company C to discuss a potential acquisition of InvenSense. Discussions were general, no proposal was made and the parties did not discuss InvenSense's valuation. The parties agreed to further conversations.

38.     On April 8, 2016, representatives of TDK and the Company discussed a potential strategic transaction, including product and technical collaborations.

39.     On May 20, 2016, the Company had an initial meeting with representatives of Company D to discuss a potential strategic transaction. The parties agreed to have a more in depth, technical meeting at a later date.

40.     On May 26, 2016, Company A's CEO presented the Company a written, non-binding offer for the acquisition of all of the outstanding common stock of InvenSense at a price per share of $8.25 in cash, which was forwarded to the Board.

41.     On May 31, 2016, TDK indicated that it would be interested in discussing a potential strategic transaction with InvenSense.

42.     On June 16, 2016, the Board held a regularly scheduled strategic meeting.  Also in attendance for a portion of the meeting were representatives of an investment bank with whom InvenSense had a prior relationship, but was ultimately not engaged after InvenSense's selection process.  After discussion of InvenSense's updated standalone plan, the current state of the semiconductor industry and the analyses of management and the investment bank, the Board approved the initiation of a process to explore various strategic alternatives.

43.     The Board directed Defendant Abdi to begin high-level strategic discussions with the candidates he had identified, to select and engage a financial advisor, and to enter into further discussions with Company A in order to provide Company A with a better understanding of the existing and future value of InvenSense.

44.     The Board also discussed InvenSense's current stock price and their view that it

did not represent InvenSense's intrinsic value because InvenSense had invested in new technology that would enable product and customer diversification over the longer term. The Board then discussed how a proposal would need to reflect InvenSense's intrinsic value and not just a premium to market. The Board concluded that Company A would need to increase its offer to properly reflect the intrinsic value of InvenSense

45.     The Board also formed a special committee (the "Strategic Committee"), composed of Defendants Higashi, Olson, Shah and Yu to oversee the process and the negotiation of the terms and conditions of any strategic transaction.

46.     During the process, 33 parties were contacted, 12 parties who demonstrated interest held meetings with InvenSense or received materials under non-disclosure agreements, based on those meetings eight parties were provided a copy of InvenSense's long-range plan, eight parties were provided proposal process letters and three parties who made proposals to acquire InvenSense were granted access to InvenSense's data room.

47.     Following the Board's June 16, 2016 meeting through September, the Strategic Committee continued to meet with and assess  investment banks and ultimately selected Qatalyst Partners.

48.     On June 20, 2016, representatives of InvenSense's senior management and representatives of Company E held a meeting to discuss a potential joint venture, but did not discuss an acquisition of InvenSense by Company E.

49.     On June 21, 2016 and June 23, 2016, Company management and TDK discussed a potential strategic transaction, but discussions were general and no specific proposal was made.

50.     On June 22, 2016, Company management met with representatives of Company D to discuss a potential strategic transaction.

51.     On June 23, 2016, Defendant Abdi met with a representative of Company C to

further discuss a potential strategic transaction.

52.     On June 30, 2016, Company management met with representatives of Company A to reiterate that the Board had rejected Company A's proposal and that Company A would need to increase the price per share in its proposal.

53.     On July 6, 2016, Defendant Abdi met with representatives of Company B to discuss a potential strategic transaction and to inform them that InvenSense had recently received unsolicited indications of interest to acquire InvenSense.

54.     On July 7, July 11 and July 15, 2016, representatives of InvenSense and representatives of TDK met to further discuss possible technical, product and business collaborations.

55.     On July 11, 2016, the Strategic Committee held a meeting to discuss InvenSense's ongoing process of reviewing its strategic alternatives.

56.     On July 14, 2016, representatives of InvenSense and Company E met to further discuss a possible joint venture. After the meeting, InvenSense requested that Company E prepare revenue projections for a collaborative product offering and a potential joint venture.

57.     On July 20, 2016, Company management met with representatives of Company D during which the attendees further discussed potential avenues of collaboration between the parties.

58.     On August 11, 2016, representatives of Company F met with the Company to discuss a possible strategic transaction.

59.     On August 13, 2016, Company management met with representatives of Company A met to discuss certain aspects of InvenSense's business, fiscal 2018 outlook and long-range plan with the goal of increasing Company A's proposed per share offer price.

60.     From August 15, 2016 to August 19, 2016, Company management met with

executives from eight potential strategic partners, including Company F, Company G, Company H, Company I and Company J.

61.    On August 24, 2016, representatives of InvenSense and Company E met to continue their discussion of a possible joint venture.

62.    On August 28, 2016, Defendant Abdi had a telephone call with a representative of Company C to answer diligence questions and to further discuss a potential strategic transaction.

63.    On August 29, 2016, Company management met with representatives of Company G to continue discussions from their meeting earlier in August.

64.    Further meetings with Company C, TDK, and Company E occurred between August 30 and September 12, 2016.

65.    On September 12, 2016, Company A sent a revised, non-binding, written proposal to InvenSense with an offer price of $10.00 per share, consisting of 60% cash and 40% newly issued shares of Company A common stock. The Company also met with representatives of Company K.

66.    On September 14, 2016, the Strategic Committee held a telephonic meeting, and directed Defendant Abdi to contact Company A to schedule meetings at which InvenSense's management could conduct diligence on Company A so that the Strategic Committee and the Board could better assess its offer.

67.    Between September 15, 2016 and September 16, 2016, the Company had calls and/or meetings with Company A, D and TDK.

68.    On September 19, 2016, the Strategic Committee decided to engage Qatalyst Partners to be the Board's financial advisor.

69.    Between September 20, 2016 and September 29, 2016, the Company and/or Qatalyst Partners held meetings and/or calls with, TDK, Company A, Company C, Company D,

Company G, Company H, Company I, Company J, Company K, Company L, Company M, and Qatalyst Partners reached out to six additional parties.

70.     On September 30, 2016, a representative of TDK sent a non-binding letter of intent providing for an all-cash acquisition of InvenSense at a proposed price of $10.00 to $11.00 per share.

71.     On October 3, 2016, the Strategic Committee held a meeting with members of management where InvenSense's ongoing exploration of its strategic alternatives was discussed. The Strategic Committee decided not to expand the number of entities contacted at that time.

72.     On October 4, 2016, a representative of Qatalyst Partners informed a representative of Company A that the Strategic Committee had determined that Company A's proposal did not reflect the intrinsic value of InvenSense, that InvenSense had received another proposal, and that InvenSense was undertaking a more formalized process with a proposal deadline of October 26, 2016.

73.     On October 12, 2016, a representative of TDK sent Defendant Abdi a revised non-binding, written proposal with a per share range of $11.00 to $12.00.

74.     By the deadline on October 26, 2016, no parties had submitted a proposal to acquire InvenSense other than Company A and TDK.  However, Company F requested additional diligence materials in order to make an offer. Additionally, Company C informed representatives of Qatalyst Partners that it was going to discuss a potential proposal at its board meeting the following afternoon and would not be able to submit an offer by the deadline. Representatives of Company L contacted a representative of Qatalyst Partners to inform them that Company L was still considering a potential transaction and would revert as quickly as possible.  Representatives of Company K contacted Defendant Abdi to inform him that Company K wanted to participate in InvenSense's process and asked to be introduced to representatives of

Qatalyst Partners.  A representative of Company N emailed representatives of Qatalyst Partners to inform them that Company N was interested in participating in the process and scheduled a meeting for November 11, 2016.

75.     On November 1, 2016, representatives of Qatalyst Partners indicated to Bank of America Merrill Lynch ("BofAML"), TDK's financial advisor, that the per share price in TDK's revised proposal was too low and that InvenSense was seeking a price per share closer to $14.00.

76.     On November 7, 2016, Company management met with Company O to discuss a potential acquisition.

77.     On November 16 and 17, 2016, several InvenSense executives and representatives of Qatalyst Partners met with representatives of TDK, BofAML and with counsel.  A representative of TDK informed Defendant Abdi that a condition of TDK's willingness to acquire InvenSense would be the post-acquisition retention of all key personnel, including Defendant Abdi and InvenSense's other executives. No specific details were discussed.

78.     On November 18, 2016, representatives of Company A advised representatives of Qatalyst Partners that they wanted to move forward and requested access to InvenSense's data room to access additional information, including information on InvenSense's planned products, so that they could properly value InvenSense's business. On November 19, 2016, Company A was provided access to InvenSense's data room. On December 2, 2016, representatives of Company A and a representative of Qatalyst Partners had a telephone conversation, during which the representative of Company A expressed doubt that Company A would complete its diligence in time to be able to submit a proposal by the December 6 deadline.

79.     On December 6, 2016, TDK submitted a written, non-binding proposal to acquire InvenSense for $12.50 per share. On that same day, representatives of InvenSense received Company E's official proposal for a joint venture. The proposal contemplated a $40 million cash

payment to InvenSense upon formation of an automotive joint venture and a payment of up to $160 million in cash to InvenSense over the following five years, subject to the achievement of commercial milestones.

80.     On December 7, 2016, a representative of Company A informed a representative of Qatalyst Partners that Company A was targeting to submit a proposal to acquire InvenSense on December 9, 2016.   Also on that same day, a representative of a financial sponsor of Company O had a telephonic discussion with Defendant Abdi, during which he informed Defendant Abdi that his company had raised $500 million and that he wanted to form a syndicate to participate in InvenSense's process.

81.     On December 8, 2016, after discussion of the value of acquiring InvenSense to TDK, the representatives of TDK offered $13.00 per share and indicated it was TDK's best and final offer. Defendant Abdi countered with $14.00 per share and the representative of TDK stated that $13.00 was TDK's final offer.

82.     On December 9, 2016, the Board held a telephonic meeting to discuss recent updates in InvenSense's process and the most recent proposal received from TDK.  The Board determined that TDK Corporation's proposal was superior to the joint venture proposal of Company E due to the uncertainty of the milestone payments and value of the overall deal to InvenSense's stockholders.

83.     On December 12, 2016, counsel for the Company and TDK reviewed the initial draft of the Voting Agreement.

84.     On December 13, 2016, a representative of a financial sponsor of Company O had a telephonic meeting with Defendant Abdi, during which he requested that Company O be provided access to InvenSense's data room. Later that day, Defendant Abdi introduced the representatives of Company O to representatives of Qatalyst Partners by email and noted that the

Board would likely want to see a letter of financial commitment as part of any proposal from Company O because Company O had indicated that it did not have sufficient cash on hand to fund a transaction.

85.     On December 14, 2016, the Strategic Committee held a telephonic meeting to discuss InvenSense's exploration of its strategic alternatives, and directed management and Qatalyst Partners to continue discussions with TDK, to push for a price in excess of $13.00, and to proceed with further discussions with Company O.

86.     On December 15, 2016, a representative of Company O sent representatives of Qatalyst Partners a non-binding, written indication of interest to acquire for cash all of the outstanding common stock of InvenSense at a price of $15.00 per share.

87.     On that same day, representatives of TDK informed Defendant Abdi that $13.00 per share was TDK's best and final offer and that the offer would expire on December 21, 2016.

88.     On December 16, 2016, the Board held a telephonic meeting to discuss InvenSense's ongoing negotiations with TDK and Company O's proposal. The Board directed management to continue discussions with TDK, including negotiating for a higher price.

89.     On that same day, representatives of Qatalyst Partners telephoned representatives of Company O and advised them that InvenSense was not in a position to slow the negotiations with other interested parties due to the high degree of uncertainty about Company O's ability to consummate a potential transaction, including its ability to raise the necessary financing and to receive the required regulatory approvals, and the considerable amount of time it would take Company O to conduct due diligence and negotiate a definitive agreement. On that same day representatives of Qatalyst Partners provided representatives of Company O access to InvenSense's data room.

90.     On December 19, 2016, after a meeting, Company O asked for 24 hours to make a

decision and they were told that the Board must receive a final proposal before the meeting the next day. Company O's advisors requested additional information so that they could make a decision on whether to make a final offer, which representatives of Qatalyst Partners provided later.

91.     On December 20, 2016, the Board held a telephonic meeting.  Representatives of Qatalyst Partners informed the Board that Company O was not prepared to make an offer at this time. Representatives of Qatalyst Partners and management updated the Board on negotiations with TDK and the fact TDK was unwilling to increase its offer.

92.     A representative of Qatalyst Partners then reviewed with the Board Qatalyst Partners' financial analysis of the $13.00 per share cash consideration to be offered to InvenSense's stockholders in the proposed merger, responded to questions from members of the Board regarding its financial analysis, and delivered Qatalyst Partners' oral opinion to the Board, subsequently confirmed by delivery of a written opinion.

93.     The Board then unanimously determined that (i) the Merger Agreement and the transactions contemplated by the Merger Agreement, on the terms and subject to the conditions set forth therein, are fair to and in the best interests of InvenSense and its stockholders (including the unaffiliated stockholders), (ii) approved and declared advisable the Merger Agreement and the transactions contemplated thereby and (iii) resolved to recommend the approval and adoption of the Merger Agreement and the merger by the stockholders of InvenSense.

94.     On December 21, 2016, the parties executed the Merger Agreement and certain members of InvenSense's management, including Defendant Abdi, entered into retention agreements. InvenSense's officers and directors, both in their individual capacities and on behalf of their funds, executed Voting Agreements.

**The Proposed Transaction**

95.     On December 21, 2016, InvenSense and TDK issued a press release announcing the Proposed Transaction as follows:

TOKYO, Japan, SAN JOSE, California, U.S.A., December 21, 2016 - TDK Corporation (President and CEO: Shigenao Ishiguro, hereinafter referred to as "TDK") and InvenSense, Inc. (President and CEO: Behrooz Abdi, hereinafter referred to as "InvenSense") entered into a definitive agreement today wherein TDK agrees to acquire all of the outstanding InvenSense shares for cash at an acquisition price of USD 13.00 per InvenSense share, for a total acquisition price of USD 1.3 billion. The transaction has been unanimously approved by the Boards of Directors of both companies. Completion of the transaction is expected in second quarter of the fiscal year ending March 31, 2018, and is subject to approvals by InvenSense shareholders and the relevant regulatory authorities. The acquisition will be completed through a merger of a newly created subsidiary of TDK with and into InvenSense, with InvenSense continuing following the merger as a wholly-owned subsidiary of TDK.

TDK's current medium-term (3-year) management plan ending in March 2018 focuses on the importance of three areas: a) automotive, b) manufacturing devices and energy, and c) Information and Communications Technology (ICT). As part of its strategy for growth in these key areas, TDK has identified sensors and actuators, energy units and next-generation electronic components as three product areas for strategic growth aimed at unlocking new business opportunities in the fields of Internet of Things (IoT). Sensors are viewed as an important IoT-enabling technology and TDK envisions greatly expanding this portion of its business and providing a broad range of sensor solutions to its customers. TDK currently sells magnetic sensors that employ thin-film magnetic technology, which TDK has accumulated through its endeavors with hard disk drive (HDD) solutions over many years. Further, TDK's product line includes pressure, temperature, electric current, and various other sensor types, and TDK plans to expand its sensor business going forward.

Through the acquisition of InvenSense, TDK will be able to strengthen its product line-ups and technologies, which is expected to enable the combined company to become a stronger player in broad based sensor solutions for IoT, automotive and ICT by accelerating the sensor product roadmap to offer innovative next generation products and platforms. In addition, sensor fusion, the combination of various sensor technologies and software creates products with enhanced value solutions for customers across multiple fields.

InvenSense is a world forerunner in motion sensor solutions, known mostly for its flagship six-axis and nine-axis motion sensors, which are used in some of the world's most advanced consumer products and applications. In recent years its portfolio has expanded with additional solutions for inertial, environmental, microphone, and ultrasonic sensors. InvenSense's "fabless" manufacturing model enables development of high-performance and cost effective products via its unique CMOS-MEMS production process. Enhanced by its value-added software solutions,

CLASS ACTION COMPLAINT

InvenSense has expanded rapidly to become a worldwide strong player in sensors for consumer devices including smartphones, drones, wearables, gaming, inertial navigation, and both optical and electronic image stabilization for cameras. Looking ahead, growth avenues beyond mobile include large addressable opportunities in the fields of IoT, automotive, and industrial, driven by increasing consumer demand of indoor navigation, Virtual Reality (VR), Augmented Reality (AR), and Advanced Driver Assistance Systems (ADAS).

The acquisition will enable TDK to combine InvenSense's advanced suite of sensor and software platforms with its wide-ranging portfolio of magnetic, pressure, temperature, and microphone sensors. In addition, sensor fusion, combining various types of technologies and product line-up, creates products with high added value. Sensor fusion combines multiple sensors and software solutions that enables TDK to expand its business in the three key areas and further strengthening of its position as a global player in the sensor business, which is one of TDK's strategic growth products.

In January 2016, TDK established a joint venture with Qualcomm Incorporated, called RF360 Holdings Singapore PTE, Ltd., and has also entered into agreements to expand technical cooperation in a wide range of fields including passive components, batteries, wireless power transfer, sensors, MEMS and various other next-generation technologies for mobile communications, IoT, and automotive. This joint venture presents an exciting opportunity for InvenSense to expand its customer base in ICT (Information and Communications Technology), IoT and automotive areas while enabling InvenSense to provide sensor solutions with increased synergies.

As the fields of ICT, automotive and industrial experiences growing demand for sensors, TDK, together with InvenSense, expect to provide unique products and sensor expertise across sales channels and a global customer base that TDK and InvenSense have each cultivated over several years. TDK and InvenSense are resolved to exhibit the same level of commitment to providing customers with quality, expert solutions and customer service as a combined company.

TDK's President and CEO, Mr. Shigenao Ishiguro, made the following statement regarding the acquisition:

"TDK's sensor business, one of its strategic growth areas, can be strengthened by merging TDK's portfolio of magnetic sensor technologies (where its strength lies) and its wide range of sensor products with InvenSense's expanding sensor technology. This acquisition is a fundamental element in TDK's strategy to provide unique and high-value-added products and services in IoT. We aim to become a strong player in the sensor business with InvenSense as our perfect partner."

InvenSense's President and CEO Behrooz Abdi made the following comment:

"This is an exciting day for InvenSense as our proposed acquisition by TDK represents what we view as a compelling win for InvenSense's shareholders,

customers and employees. TDK understands the value of InvenSense's suite of sensor and software platforms. This merger is the culmination of years of innovation and execution by our world-class employees. Together with TDK, we see a bright future that leverages our commitment to innovation with TDK's scale, significant partner relationships and distribution channel. Our strategic goals are aligned, and we are confident that together with TDK we will accelerate our roadmap to provide next-generation sensor technologies in key fields for the world's most innovative companies."

In connection with the acquisition, BofA Merrill Lynch is acting as TDK's exclusive financial advisor and Jones Day is acting as legal counsel to TDK. Qatalyst Partners is acting as exclusive financial advisor and Pillsbury Winthrop Shaw Pittman LLP is acting as legal counsel to InvenSense.

**The Unfair Price**

96.     The failure of the Individual Defendants to secure an adequate price is apparent from the flawed sales process, which was designed to advantage TDK and deter potential competing bids. Under the terms of the Merger Agreement, InvenSense stockholders will receive $13.00 per share in cash for each share of InvenSense common stock.

97.     The proposed consideration is woefully inadequate in light of InvenSense's true value and growth prospects.

98.     The Board should have leveraged InvenSense's position to extract more consideration and a more favorable merger agreement and should have negotiated a fair change of control premium on behalf of InvenSense's stockholders. Instead, the Board agreed to a deal with TDK without fulfilling its fiduciary duties to maximize stockholder value. Given these factors as well as InvenSense's prospects for growth, the merger consideration is inadequate and significantly undervalues the Company (especially considering that Company O offered $15 per share).

99.     Moreover, the financial analyses performed by the Company's own financial advisor, Qatalyst Partners, confirms the inadequacy of the consideration.  For example, the *Illustrative Discounted Cash Flow Analysis* yielded values for the Company's common stock as

high as $19.63 per share.

**The Merger Agreement's Preclusive Terms and Deal Protection Provisions Favor TDK**

100.    Compounding the harm associated with the unfair consideration, the terms of the Merger Agreement unreasonably favor TDK over any other potential bidders for InvenSense.

101.    To protect TDK's ability to secure the benefits it anticipates in the Proposed Transaction, and to ensure that no competitive bidder will step in to reap those benefits, TDK negotiated, and the Board granted, unreasonable deal protections. The Merger Agreement contains preclusive measures, considered collectively and in context, that will hinder the emergence of a superior offer.

102.    First, InvenSense and the Individual Defendants agreed to a strict "no solicitation" provision in the Merger Agreement that prohibits InvenSense or the Individual Defendants from taking any actions that might lead to a better deal for InvenSense stockholders. Specifically, the Merger Agreement provides that InvenSense shall not, and shall cause its representatives or subsidiaries not to directly or indirectly "(i)  solicit, initiate or take any action to knowingly facilitate or knowingly encourage the making, submission or announcement of any inquiry, proposal or offer (including any inquiry, proposal or offer to the Company's stockholders) which constitutes or would be reasonably expected to lead to any Acquisition Proposal" (as defined in the Merger Agreement).

103.    Second, the Merger Agreement grants TDK matching rights, including the right to be provided with confidential, non-public information concerning any competing acquisition proposal from a third party and the right to be provided with any non-public information or data provided to a possible competing bidder that was not previously made available to TDK, which information TDK then could use to prepare a matching bid. In the event of a superior offer, the Merger Agreement also automatically gives TDK several business days to renegotiate the terms

of the Proposed Transaction.

104.   Third, the Merger Agreement also contains a highly restrictive "fiduciary out" provision permitting the Board to change its recommendation in favor of the Proposed Transaction and/or pursue a superior proposal only under extremely limited circumstances. The Company must give TDK oral and written notice of any superior proposal, including the material terms and conditions of the superior proposal and the identity of the party making it. Further, TDK must be provided five days' notice to renegotiate its own proposal (*i.e.*, "matching rights").

105.   Fourth, the Merger Agreement requires that InvenSense pay TDK a $46.7 million termination fee in the event InvenSense terminates the Merger Agreement to pursue a superior proposal.

106.   The Individual Defendants agreed to these deal protection provisions, which further restrain the Company's ability to solicit or negotiate with any third party other than TDK concerning a possible acquisition of the Company. The deal protection measures in the Merger Agreement will preclude the emergence of a superior offer.

**Conflicts of Interest and Related Omissions/Misstatements**

107.   The financial advisor, Qatalyst Partners, may have conflicts of interest. As provided in the Proxy, Qatalyst Partners provides investment banking and other services to a wide range of corporations and individuals, domestically and offshore, from which conflicting interests or duties may arise.  Affiliates of Qatalyst Partners may at any time hold long or short positions, and may trade or otherwise effect transactions in debt or equity securities or loans of InvenSense, TDK or certain of their respective affiliates.  Further, Qatalyst Partners and its affiliates may in the future provide investment banking and other financial services to InvenSense or TDK or any of their respective affiliates for which it would expect to receive compensation.

108.    Pursuant to a letter agreement dated September 27, 2016, Qatalyst Partners provided the Company with financial advisory services in connection with the Merger for which it will be paid approximately $25.5 million, $1.5 million of which was payable upon the delivery of its opinion, and the remaining portion of which will be paid upon, and subject to, consummation of the Transaction.  The Company has also agreed to reimburse Qatalyst Partners for its expenses incurred in performing its services.

109.    Further, the equity-based awards held by non-employee directors, to the extent then unvested, will accelerate and vest upon the consummation of the Transaction, which creates conflicts.  In connection with the Transaction, InvenSense entered into letter agreements with Defendant Abdi, which provide for the accelerated payment immediately following the Transaction of a percentage of the deferred cash award attributable to the otherwise unvested portion of his equity awards (limited, however, to unvested shares of restricted stock in the case of Defendant Abdi), to which he will become entitled at the effective time of the Transaction. Such accelerated payment will proportionately reduce any future payments to be made to them on the applicable vesting dates with respect to such deferred cash awards. The accelerated payment of a percentage of such deferred cash awards is effectively the same as accelerated vesting at the time of the consummation of the Transaction of that percentage of the otherwise unvested portion of their equity awards (limited, however, to unvested shares of restricted stock in the case of Defendant Abdi).

110.    Further, in the case of the named executive officers, pursuant to their executive change in control and severance agreements, 100% of the equity awards held by them that will not vest prior to or upon the consummation of the Transaction are subject to accelerated vesting (on a "double-trigger" basis) in the event of a qualifying termination within 90 days prior to or 18 months following the consummation of the Transaction (for Defendant Abdi) or within 30

days prior to or 18 months following the consummation of the Transaction (for the other named executive officers). In total, Defendant Abdi will be due $2,209,607.

111.     Further, the Merger Agreement provides that the officers of InvenSense at the effective time of the merger will be the officers of InvenSense, as the surviving corporation, after the consummation of the Transaction.

112.     Moreover, Defendant Abdi holds a performance stock option award covering 200,000 shares of common stock with an exercise price of $5.65 per share that provides for a performance-based vesting component and a time-based vesting component. The performance-based vesting component is treated as being satisfied if the Company's common stock trades at a closing price per share that is equal to or greater than $12.50 per share for 20 consecutive trading days on the NYSE. Once the performance-based vesting component has been satisfied, the option then vests monthly over four years commencing on the date that the performance-based vesting component has been satisfied. However, because the merger consideration is equal to $13.00 per share, pursuant to the terms of the performance stock option award, the performance-based vesting component will be treated as being satisfied upon the consummation of the Transaction.  The time-based vesting component will continue to apply, such that the deferred cash award into which the performance stock option is converted will be subject to monthly vesting over four years beginning on the date of the consummation of the Transaction.

113.     All equity awards will be cashed out in connection with the consummation of the Transaction, which creates a conflict of interest among the Board related to the Proposed Transaction.  Defendant Faintuch will be due $203,294; Defendant Fayyad will be due $203,294; Defendant Higashi will be due $203,294; Defendant Olson will be due $737,494; Defendant Shah will be due $261,094; Defendant Stang will be due $203,294; and Defendant Yu will be due $359,694.

CLASS ACTION COMPLAINT

114.    Additionally, pursuant to the Merger Agreement, the Company may make bonus payments to named executive officers (and certain non-named executive officers) under the executive bonus plan for the fiscal year ended March 31, 2017, in accordance with the achievement of the currently established performance targets, provided that the aggregate payments under such bonus plan do not exceed $1.5 million in the aggregate.

115.    Additionally, members of management are acquiring post-termination payments that create conflicts of interest.    Each of the named executive officers (other than Defendant Abdi) has an Executive Change in Control and Severance Agreement under which the named executive officer would be entitled to the following payments and benefits (subject to any applicable withholding taxes) if the named executive officer's employment is terminated for "Good Reason" or without "Cause" (as such terms are defined in the applicable executive change in control and severance agreement) either 30 days prior to, or within 18 months following, a change in control of InvenSense: payment of an amount equal to 12 months of the greater of the base salary in effect immediately prior to the change in control or the then-current annual base salary; payment of any earned but unpaid bonus for the prior fiscal year; payment of an amount equal to the lower of the current year target annual bonus or the amount of the most recent annual bonus paid; the acceleration of vesting (or release from repurchase rights, as applicable) with respect to 100% of the named executive officer's then-outstanding and unvested equity awards; extension of the exercise period for outstanding stock options which are assumed by six months; and reimbursement of monthly medical insurance premiums under COBRA (if elected) for 18 months or, if shorter, until the named executive officer becomes eligible to participate in a subsequent employer's group health plan.

116.    Defendant Abdi has an executive change in control and severance agreement under which he would be entitled to the following payments and benefits (subject to any

applicable withholding taxes) if his employment is terminated for "Good Reason" or without "Cause" (as such terms are defined in his executive change in control and severance agreement) either 90 days prior to or within 18 months following a change in control of InvenSense: payment of any earned but unpaid bonus for the prior fiscal year; payment of an amount equal to 150% of the weighted average of the current year target annual bonus and the amount of the most recent annual bonus paid, with such weighted average determined based on the percentage of the current year completed prior to Defendant Abdi's termination of employment; the acceleration of vesting (or release from repurchase rights, as applicable) with respect to 100% of his then-outstanding and unvested equity awards, to the extent that such equity awards have commenced to vest (or, in the case of performance awards based on the closing stock price being at a sustained level for 20 days, would have commenced to vest had the 20-day trading price equaled the price per share paid in the change in control); extension of the exercise period for outstanding stock options which are assumed by 12 months; and lump-sum cash payment of an amount equal to the reasonably estimated cost of 18 months of continued medical insurance premium payments under COBRA (based on the Company's costs for medical insurance coverage prior to termination).

117.    In connection with the Transaction, the Company entered into letter agreements with Defendant Abdi, and Mssrs. Goehl and Maghsoudnia (each, a "Recipient," and collectively, the "Recipients") providing for the payment of a retention bonus ("Retention Bonus") to each Recipient if (a) the Recipient remains an employee of InvenSense until the later of (i) the date on which the transactions contemplated by the Merger Agreement are consummated and (ii) the first anniversary of the date on which the Merger Agreement is fully executed (such later date, the "Vesting Date"), or (b) the Recipient's employment with InvenSense terminates prior to the Vesting Date as a result of a termination by InvenSense without "Cause" (as defined in the letter

agreement) or the Recipient's death or permanent disability (such date of termination, the "Termination Date"). The letter agreements also provide for the accelerated payment of a percentage of the total cash value payable for certain unvested equity awards held by the Recipients under the "Company Stock Plans" (as defined in the Merger Agreement), which accelerated payment will proportionately reduce any future payments to be made to the Recipient on the applicable vesting dates with respect to such awards (such percentage, the "Equity Award Acceleration Percentage"). The individual Equity Award Acceleration Percentages for Defendant Abdi and Mssrs. Goehl and Maghsoudnia are 20%, 25% and 42%, respectively, which apply to all outstanding unvested awards held under any Company Stock Plan (limited, however, to unvested shares of restricted stock in the case of Defendant Abdi) and apply to each tranche of unvested equity awards held by them (limited, however, to unvested shares of restricted stock in the case of Defendant Abdi). The letter agreements also amend the definition of "Good Reason" in each Recipient's executive change in control and severance agreement with InvenSense to provide that neither the consummation the Transaction nor any changes that are made to the nature or scope of the Recipient's title, duties, authorities, function, responsibilities, reporting structure or signing authority solely as a result of the consummation of the Transaction would trigger Good Reason for the termination of the Recipient's employment.

118.   The letter agreement for Defendant Abdi also provides for certain additional bonuses (collectively, the "Additional Retention Bonus"). Pursuant to his letter agreement, Defendant Abdi will be entitled to:

- a lump sum cash payment in an amount up to $857,500 if (a)(i) he remains employed through March 31, 2018 and (ii) for our fiscal year ending March 31, 2018, InvenSense's revenue as reported on InvenSense's audited financial statements in accordance with historical practices and GAAP exceeds $315,440,000 or (b) his employment with InvenSense terminates prior to March 31, 2018 as a result of a termination by InvenSense without Cause or his death or permanent disability. The amount of this bonus is equal to the product of $857,500, multiplied by a fraction, the numerator of which is the difference between the actual revenue for fiscal year ending March 31, 2018 and

$315,440,000 and the denominator of which is $78,860,000. In no event will this bonus exceed $857,500. In the event of any termination of Defendant Abdi's employment prior to March 31, 2018 as a result of a termination by InvenSense without Cause or his death or permanent disability, the amount of the bonus payment will be equal to $857,500.

- A lump sum cash payment in an amount up to $857,500 if (a)(i) he remains employed through March 31, 2018 and (ii) for our fiscal year ending March 31, 2018, InvenSense's operating profit calculated in accordance with InvenSense's historical practices on a non-GAAP basis that excludes stock-based compensation expense and related payroll taxes, accreting interest expense on InvenSense's 1.75% convertible senior notes, amortization of acquisition-related intangible assets, business acquisition costs and litigation-related expenses ("Operating Profit") exceeds $29,760,000 or (b) his employment with InvenSense terminates prior to March 31, 2018 as a result of a termination by InvenSense without Cause or his death or permanent disability. The amount of this bonus is equal to the product of $857,500, multiplied by a fraction, the numerator of which is the difference between the actual Operating Profit for fiscal year ending March 31, 2018 and $29,760,000 and the denominator of which is $7,440,000. In no event will this bonus exceed $857,500. In the event of any termination of Mr. Abdi's employment prior to March 31, 2018 as a result of a termination by InvenSense without Cause or his death or permanent disability, the amount of the bonus payment will be equal to $857,500.

- A lump sum cash payment in an amount up to $857,500 if (a)(i) he remains employed through March 31, 2019 and (ii) for our fiscal year ending March 31, 2019, InvenSense's revenue as reported on InvenSense's audited financial statements in accordance with historical practices and GAAP exceeds $503,520,000 or (b) his employment with InvenSense terminates prior to March 31, 2019 as a result of a termination by InvenSense without Cause or his death or permanent disability. The amount of this bonus is equal to the product of $857,500, multiplied by a fraction, the numerator of which is the difference between the actual revenue for fiscal year ending March 31, 2019 and $503,520,000 and the denominator of which is $125,880,000. In no event will this bonus exceed $857,500. In the event of any termination of Mr. Abdi's employment prior to March 31, 2019 as a result of a termination by InvenSense without Cause or his death or permanent disability, the amount of the bonus payment will be equal to $857,500.

- A lump sum cash payment in an amount up to $857,500 if (a)(i) he remains employed through March 31, 2019 and (ii) for our fiscal year ending March 31, 2019, InvenSense's Operating Profit exceeds $60,240,000 or (b) his employment with InvenSense terminates prior to March 31, 2019 as a result of a termination by InvenSense without Cause or his death or permanent disability. The amount of this bonus is equal to the product of $857,500, multiplied by a fraction, the numerator of which is the difference between the actual Operating Profit for fiscal year ending March 31, 2019 and $60,240,000 and the denominator of which is $15,060,000. In no event will this bonus exceed $857,500. In the event of any termination of Mr. Abdi's employment prior to March 31, 2019 as a result of a termination by InvenSense without Cause or his death or permanent disability, the amount of the bonus payment will be equal to $857,500.

119.    In total, the Retention Bonus Component will add up to $5,690,000 for Defendant Aldi, while the total cash payment for unvested options, unvested RSUs and unvested shares of restricted stock will add up to $2,081,060.

120.    The letter agreement for Defendant Abdi also provides that his base salary will be

increased to a rate of $420,000 per year effective immediately, and his annual target incentive bonus opportunity for fiscal year ending March 31, 2018 (which will be in addition to the potential bonus payments described above) will be 100% of his then-current annual base salary.

121.     The Proxy also provides for golden parachute compensation for named executive officers, including Defendant Aldi.   Defendant Aldi will be due $7,872,751 as part of his compensation.   Other management stand to recieve between $4 and $4.4 million.

122.     Concurrently with the execution of the Merger Agreement, the Company's directors, executive officers and certain stockholders in their capacities as holders of common stock or other equity interests of InvenSense (the "Voting Group"), each entered into a Voting Agreement with TDK. Pursuant to the Voting Agreement, members of the Voting Group have agreed to appear at each meeting of stockholders or otherwise cause all of their shares of our common stock held of record or beneficially owned, whether currently issued and outstanding or acquired after the date of the Voting Agreement, without limitation, including by the exercising or the vesting of any stock options, RSUs or restricted stock held of record or beneficially owned (collectively, the "Stockholder Shares"), as present thereat for purposes of calculating a quorum. Members of the Voting Group have agreed to vote all of their Stockholder Shares in favor of the Proposed Transaction.

**The Materially Incomplete and Misleading Proxy**

123.     Defendants filed, or caused to be filed, the Proxy with the SEC in connection with the Proposed Transaction. As alleged herein, the Proxy omits and/or misstates material information that must be disclosed to InvenSense stockholders to enable them to render an informed decision with respect to the Proposed Transaction.

124.     With respect to Qatalyst Partners' *Illustrative Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose: (i) the terminal value of the Company; (ii) the estimated debt

outstanding of the Company; (iii) the estimated cash balance of the Company; (iv) management's inputs and assumptions for projecting a dilution factor of approximately 19%; (v) the inputs and assumptions used to calculate the discount rate range of 11.0% to 17.5%; (vi) the estimated debt outstanding and estimated cash balance as of December 31, 2016, as provided by the Company's management; and (vii) the number of fully diluted shares of InvenSense common stock outstanding as of December 15, 2016, as provided by InvenSense's management.

125.    The valuation methods used to arrive at a fairness opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed. The projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the Company's financial advisor in support of its fairness opinion.

126.    Based on the foregoing, InvenSense's stockholders lack critical information necessary to evaluate whether the Proposed Transaction is in their best interest.  Moreover, without the key financial information and related disclosures, InvenSense's stockholders cannot gauge the accuracy and reliability of the financial analyses performed by Qatalyst Partners and whether they can reasonably rely on its fairness opinion.

127.    Accordingly, Plaintiff seeks, among other things, the following relief: (i) enjoinment of the Proposed Transaction; or (ii) rescission of the Proposed Transaction in the event that it is consummated and to recover damages resulting from Defendants' misconduct.

## COUNT I

### Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder

128.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

31

129.   Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

130.   As detailed herein, Defendants disseminated the false and misleading Proxy specified above, which contained statements which, at the time and in the light of the circumstances under which they were made, were false and misleading with respect to material facts and which omitted to state material facts necessary in order to make the statements therein not false or misleading or necessary to correct earlier statements which had become false or misleading, in violation of Section 14(a) of the Exchange Act and SEC Rules promulgated thereunder, including SEC Rule 14a-9.

131.   By the use of the mails and by means and instrumentalities of interstate commerce and the facility of a national securities exchange, Defendants solicited and permitted the use of their names to solicit proxies or consents or authorizations in respect of the common shares of InvenSense.

132.   By virtue of their positions within the Company, the Individual Defendants were aware of this information and of their duty to disclose this information in the Proxy. The Proxy was prepared, reviewed, and/or disseminated by Defendants. The Proxy misrepresented and omitted material facts, including material information about the unfair sale process for the Company, the unfair consideration offered in the Proposed Transaction, and the actual intrinsic value of the Company's assets. Defendants were at least negligent in filing and disseminating the Proxy with these materially false and misleading statements and omissions. Defendants have also failed to correct the Proxy and the failure to update and correct false statements is also a violation of Section 14 of the Exchange Act and SEC Rules promulgated thereunder.

133.   The omissions and false and misleading statements in the Proxy are material in that a reasonable unitholder would consider them important in deciding whether to vote in favor

of and tender their shares in the Proposed Transaction. A reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to shareholders.

134.    Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from immediate and irreparable injury, which Defendants' actions threaten to inflict.

<u>**COUNT II**</u>

**Against the Individual Defendants for Violation of Section 20(a) of the Exchange Act**

135.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

136.    The Individual Defendants acted as controlling persons of InvenSense within the meaning of Section 20(a) of the Exchange Act, as alleged herein. By virtue of their positions as officers and directors of InvenSense and their participation in and awareness of the Company's business and operations and their intimate knowledge of the materially false statements and omissions contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

137.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be false and misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

138.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities

violations as alleged herein, and exercised the same. Among other things, the Proxy at issue contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. Thus, they were directly involved in the making of that document.

139.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy purports to describe the various issues and information that they reviewed and considered – descriptions which had input from the Individual Defendants.

140.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

141.    Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands relief in his favor against Defendants as follows:

A.    Enjoining Defendants, their agents, counsel, employees, and all persons acting in concert with them from consummating the Proposed Transaction, unless and until the Company adopts and implements a procedure or process to obtain the best available terms for unitholders and discloses, completely and accurately, the material information concerning the Proposed Transaction presently misstated/omitted in the Proxy;

B.    Rescinding, to the extent already implemented, the Proposed Transaction or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

C.    Directing the Individual Defendants to account to Plaintiff and the Class for all damages suffered as a result of the wrongdoing;

D.    Awarding Plaintiff and the Class the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

CLASS ACTION COMPLAINT

1    E.       Granting such other and further equitable relief as this Court may deem just and

2  proper.

3                                    **JURY DEMAND**

4        Plaintiff prays for a jury trial on all issues and in all proceedings so triable.

5

6  Dated:  February 27, 2017                    **LEVI & KORSINSKY LLP**

7                                               By:  _/s/ Rosemary M. Rivas_
                                                 Rosemary M. Rivas
8                                                44 Montgomery Street, Suite 650
                                                 San Francisco, CA 94104
9                                                Tel: (415) 291-2420
                                                 Fax: (415) 484-1294
10
                                                 *Counsel for Plaintiff Atef Isaac and the*
11                                               *Proposed Class*

12

13  **OF COUNSEL:**

14  **BROWER PIVEN**
     A Professional Corporation
15  Daniel Kuznicki
    475 Park Avenue South, 33rd Floor
16  New York, NY 10016
    Telephone: (212) 501-9000
17  Facsimile:  (212) 501-0300
    kuznicki@browerpiven.com
18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT